<u>FOR  PUBLICATION</u>

# UNITED  STATES  DISTRICT  COURT
# DISTRICT  OF  NEW  JERSEY

---

GARY HARRIS,                                :

              Plaintiff,        :        Civil Action No. 08-6282 (DRD)

           v.                  :        **O P I N I O N**

MICHELLE R. RICCI et al.,                   :

            Defendants.       :

---

**Appearances:**

GARY HARRIS, ID# 469121-B
      South Woods State Facility
      215 Burlington Road Sought
      Bridgeport, New Jersey 08302
      Petitioner <u>pro</u> <u>se</u>

GARY S. KULL, Esq.
      Carroll, Mcnulty & Kull L.L.C.
      120 Mountain View Boulevard
      P.O. Box 650
      Basking Ridge, New Jersey 07920
      Petitioner's former <u>pro</u> <u>bono</u> counsel

JUSTIN L. CONFORTI, Esq.
      Deputy Attorney General
      Office of the Attorney General
      Department of Law and Public Safety
      Division of Law
      25 Market Street
      P.O. Box 112
      Trenton, New Jersey 08625
      Counsel for Defendant Maniscalo

**Dickinson R. Debevoise**, District Judge:

Two motions bring this matter before the Court.  One was filed by Plaintiff who has re-assumed his pro se status.  See Docket Entries Nos. 148-151.  The other is a counseled motion filed on behalf of the remaining Defendant.  See Docket Entry No. 146.  For the reasons detailed below, both motions are denied.  However, in light of Defendant's motion, this Court's prior order is amended to the extent that Plaintiff is granted injunctive relief in the form of a curative administrative hearing.

I.      BACKGROUND

On December 12, 2008, Plaintiff, a prisoner, commenced this matter while proceeding pro se.  At the heart of his claims was a disciplinary hearing that came about after he: (a) sent money to a certain woman who was a member of another inmate's family; and (b) wrote and submitted for mailing two letters that used "code words," such as "Almighty Latin Kings" and "Tomato Heads," which are references to street gangs.[1]  When the prison authorities learned of the letters and the money wire, Plaintiff was transferred to another prison facility and housed at a special housing unit ("SHU") where inmates suspected of having connections to gang members are housed for additional surveillance.

Plaintiff was charged with two infractions.  The first is "*.010," i.e., "participation in a security threat group-related activity."  See N.J. Admin. Code §10A:4-4.1(a); accord Romero v. Hayman, 2011 U.S. Dist. LEXIS 38617 (D.N.J. Apr. 8, 2011) (possession of literature related to the Latin Kings gang qualifies as a *.010 infraction), remanded in part another ground, 486 F.

---

[1] Although Plaintiff declared a niece of another inmate his "Muslim wife" and to sent her money, the record indicates that he and that woman were never married.

App'x 981 (3d Cir. 2012).  The other infraction was "an attempt to give money to the family of

another inmate."  After a disciplinary hearing, Plaintiff was found guilty of these violations, and

his punishment included a period of solitary confinement, a period of SHU housing and loss of

commutation credits.[2]

        In his complaint, Plaintiff asserted that he was illegally transferred out of his original

facility and wrongly housed at the SHU since he is a Muslim and therefore cannot be a gang

member.  He also speculated that the disciplinary measures might have been applied to him in

retaliation because he had refused to take a polygraph test with regard to a certain gun found at

the facility where he had resided prior to the transfer.[3]

        The named Defendants are the Commissioner of the Department of Corrections, the past

and present administrators of the facility to which he was transferred, the administrator of the

facility where he was housed prior to transfer, the officer at the pre-transfer facility who offered

him a polygraph test, the officer at the post-transfer facility who held the disciplinary hearing as

---

[2]  Apparently, Plaintiff committed many other disciplinary infractions during this period of time.  Those infractions produced such charges as "perpetrating frauds, deceptions, confidence games, riots or escape plots," "possession or introduction of a weapon" and "refusing to accept a program or housing unit assignment," and resulted in additional periods of solitary confinement, SHU time and loss of commutation credits.  See Docket Entry No. 151, at 2-3.  Now, Plaintiff has bundled all the sanctions imposed upon him to come up with aggregated periods of solitary confinement and SHU time.  See id.  However, as detailed below, these aggregated periods are of no relevance here because this matter is limited to procedural errors committed with regard to the *.010 charge and the sanctions that charge produced.  The Court notes in passing that Plaintiff's mathematics failed him when he added 90 days to 365 days (since he arrived at 820 days), and when he added 60 days to 365 days and arrived at 790 days.  See id.  These mathematical errors, however, are of no importance here.

[3]  The facility where Plaintiff originally resided conducted an extensive investigation of this gun issue and, since Plaintiff was housed in the area where the gun was located, one prison officer offered Plaintiff to take a polygraph test.  Plaintiff declined, and the record makes it clear that Plaintiff was never charged or sanctioned for his election not to take the test.

to the "code words" letters, and a certain "Director of Custody Operations" who, allegedly, declined Plaintiff's request for "Islamic documents" the nature of which was never clarified.

The Court screened the complaint and dismissed Plaintiff's claim based on his transfer and his retaliation claim. The Court explained that the transfer-based claim was not cognizable legally, while the retaliation claim failed to assert facts meeting the elements of that constitutional tort. Thus, the allegations attacking the propriety of Plaintiff's disciplinary hearing became the sole surviving claim. As to that claim, the Court directed service after reflecting on the tests set forth in Wolff v. McDonnell, 418 U.S. 539 (1974), and Superintendent v. Hill, 472 U.S. 445, 454 (1985), and also upon noting that, under Carey v. Piphus, 435 U.S. 247 (1977), inmates could recover certain damages for being subjected to procedurally deficient hearings.

Four and a half years of litigation followed. During that period: (a) the Magistrate Judge directed filing of all "motion[s] to add new parties"; (b) Plaintiff, instead of naming such parties, inquired whether Defendants would pay him $1.9 million in settlement; (c) the Magistrate Judge appointed Plaintiff pro bono counsel; (e) extensive discovery took place; and (f) each side moved for summary judgment. At that point, the record established that Plaintiff was not provided with an opportunity to examine his "code words" letters prior to or even at his disciplinary hearing and, thus, he could not meaningfully ascertain the charge based on these "code words" letters. The record also established that the officer who conducted Plaintiff's disciplinary hearing at the post-transfer facility: (a) suggested that he might have based his findings, at least in part, on the investigatory conclusions reached by a prison officer employed at the pre-transfer facility; and (b)

4

may have erroneously perceived Plaintiff's statement written post-charge as one of Plaintiff's "code words" letters on which the charge was based.[4]

This Court held oral arguments and ruled on both summary judgment motions, granting and denying each one in part. See Docket Entry No. 143 (the Court's opinion); see also Harris v. Ricci, 2013 U.S. Dist. LEXIS 82034 (D.N.J. June 11, 2013) (same). This Court dismissed the claims barred by the Eleventh Amendment and those based on the theory of respondeat superior. "On the other hand," the Court observed, the hearing officer, i.e., "Officer Maniscaldo, . . . was obligated to: (a) rely [solely] on his own review of Plaintiff's ["code words"] letters . . . ; and (b) allow Plaintiff an opportunity to review these letters in preparation for [his] disciplinary hearing." Id. at *16. Since there was no dispute that Officer Maniscaldo. . . fail[ed] to comply with either or both of these . . . obligations or, at the very least, with the latter one," the Court granted Plaintiff summary judgment with regard to the procedural errors and awarded him damages. Id. at *17.

The Court's damages analysis was as follows:

The due process protections implicated by a disciplinary hearing consist of two interrelated aspects: one is of a quasi-procedural nature, . . . the other is quasi-substantive. While the procedural aspect ensues from the holding of Wolff, the substantive one provides that the findings made by a disciplinary official could be deemed valid only if they are supported by some evidence in the record. The dual rationale of Wolff-Hill analysis corresponds to the holding of Carey [where] the Supreme Court observed that . . . , if the flaw at issue is of a quasi-procedural nature, but the prisoner could have been subjected to the same disciplinary sanction under a procedurally proper hearing, the prisoner is entitled to recover only nominal damages not to exceed one dollar. . . . The case at bar presents this very scenario. Here, Plaintiff concedes that he wrote the letters utilizing the words at issue [and] he admits sending monies to a female member of another's inmate family . . . . Thus, he could have been sanctioned to the very same

_____

[4] It is not disputed that Plaintiff wrote and submitted for mailing his "code words" letters.

sanction that was imposed upon him.  Correspondingly, while he is entitled to
summary judgment under <u>Wolff</u> . . . , under <u>Carey</u>, he can recover only one dollar.
. . . [T]he analysis here does not turn on whether the disciplinary officer could
have sanctioned Plaintiff differently; rather, it turns on a diametrically opposite
inquiry, <u>i.e.</u>, whether the disciplinary officer could have imposed the very same
sanction upon conducting a procedurally proper hearing.

<u>Id.</u> at *17-21 (citations, quotation marks and brackets omitted).

Upon finding that Plaintiff was entitled to $1, the Court also conducted a <u>sua</u> <u>sponte</u>

inquiry into the amount of attorney's fee due to Plaintiff's counsel appointed by the Magistrate

Judge.  For the purposes of that analysis, the Court relied on a decision arising from the Third

Circuit Court of Appeals, <u>Velius v. Twp. of Hamilton</u>, 466 F. App'x 133 (3d Cir. 2012).[5]  In

<u>Velius</u>, the Third Circuit Court of Appeals ruled that a district court's resort to the lodestar

method of fee calculation was inappropriate in those cases that yielded only nominal damages.

Judge Thomas M. Hardiman ("Judge Hardiman"), writing on behalf of the Panel, noted that the

issue of "whether attorneys' fees should be awarded to civil rights plaintiffs who receive only

nominal damages [was a]  source of confusion" and "review[ed] the controlling precedents in . . .

detail," stating:

In <u>Farrar v. Hobby</u>, the majority . . . noted that the "technical nature" of a nominal
damages award nevertheless "bears on the propriety of fees awarded under §
1988." 506 U.S. 103, 114 (1992).  Given the general principle that courts must
"give primary consideration to the amount of damages awarded as compared to
the amount sought" in awarding fees, <u>id.</u>, in nominal damages cases, the
calculation of fees under the traditional lodestar standard "may be an excessive
amount," <u>id.</u> (quoting <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 436 (1983)).  Although
<u>Farrar</u> preserved the trial judge's right to award fees equal to the lodestar, the
Court also opined that "when a plaintiff recovers only nominal damages . . . the

_____

[5]  In <u>Velius</u>, a plaintiff successfully established a Fourth Amendment violation but
obtained only nominal damages of $1.  His counsel, however, sought $82,600 in attorney's fee.
The counsel was eventually awarded $2,259, a figure determined by the district court upon its
resort to the lodestar method of calculation.  <u>See</u> <u>Velius</u>, 466 F. App'x at 134-35 and 140.

only reasonable fee is usually no fee at all." Id. at 115.  At the same time, it
emphasized the broad discretion of district courts to award attorneys' fees in
nominal damages cases.  See id. at 114-15.  Thus, the Court concluded that
district courts "may lawfully award low fees or no fees without reciting the 12
factors bearing on reasonableness or multiplying 'the number of hours reasonably
expended . . . by a reasonable hourly rate.'"  Id. at 115 (alteration in original)
(internal citation omitted) (quoting Hensley, 461 U.S. at 430 n.3).  Although she
joined the majority in Farrar, Justice O'Connor authored a separate concurrence
"only to explain more fully why . . . it was appropriate to deny fees in that case."
Id. at 116 (O'Connor, J., concurring).  Justice O'Connor . . . sought to clarify
where attorneys' fees would be proper and noted that "a substantial difference
between the judgment recovered and the recovery sought suggests that the victory
is in fact purely technical."  Id. at 121.  In addition, "the significance of the legal
issue" on which the plaintiff prevailed should inform the fee award.  Id.  Finally,
'success might be considered material if it also accomplished some public goal."
Id. at 121-22.  . . .  We read Farrar to grant district courts substantial discretion to
decide whether no fee or *some fee would be reasonable*, as long as they
acknowledge that a nominal damages award is presumptively a technical victory
that does not merit an award of attorneys' fees. Whenever the . . . court determines
that no fee or a low fee is proper, Farrar eliminates the need to apply multi-factor
tests or calculate the lodestar and permits a district court to determine the amount
of any low fee award it deems is warranted by whatever means it chooses in its
broad discretion.  See Farrar, 506 U.S. at 115.  . . .  Farrar does *not* establish any
rule . . . dictating how fees must be calculated *if a court determines that a low fee
is appropriate*.

Harris, 2013 U.S. Dist. LEXIS 82034, at *27-29 (quoting Velius, 466 F. App'x at 138 (brackets

omitted, emphasis supplied)).

Applying that method, the Velius Court affirmed the plaintiff's $1 award but vacated the

$2,259 lodestar-based fee and remanded the matter for reassessment.  See Velius, 466 F. App'x

at 141.  Nothing in Velius called the district court's attention to a statutory provision of any sort

or to any other case law.  See id.  Nor does Velius suggest a fixed cap limiting the attorney's fee.

See id. This Court, therefore, directed the parties' attention to Velius and, employing the

guidance provided therein, concluded:

7

the Court is mindful that the "technical victory" achieved in this matter . . . serves the public goal which is rarely headlines grabbing but which is, nonetheless, quite important, i.e., the goal of ensuring that the rights of prisoners, while limited, are treated with respect and fully enforced.  Noting that, unlike the verdict in Velius, the holding of this matter is neither "obtuse" nor incapable of deterring future misconduct, the Court finds that an award of very low attorney's fee, not tied to a lodestar analysis, would be more appropriate than no award at all.  See Hawa Abdi Jama v. Esmor Corr. Servs., 577 F.3d 169 (3d Cir. 2009) (collecting cases and pointing out that a very low fee is not inappropriate even in a  case that has a relatively small public goal value); see also Lefemine v. Wideman, 133 S. Ct. 9, 11 (2012) ("Because the plaintiff is a 'prevailing party,' he 'should ordinarily recover some attorney's fee unless special circumstances would render such an award unjust'") (quoting Hensley, 461 U.S. at 429); accord Lawrence v. Western Pipe Serv., 146 F.R.D. 195 (N.D. Ala. 1993) (where the plaintiff recovered $350, the court found it warranted to award the lump sum of $2,500 to cover, jointly, attorney's fee and costs of litigation), aff'd without opinion 19 F.3d 1446 (11th Cir. 1994).  Reflecting on the Supreme Court and Court of Appeals' guidance and applying it [here], this Court finds $300 attorney's fee the most suitable.

Harris, 2013 U.S. Dist. LEXIS 82034, at *31-32.

At that point, this case was closed, and the appointment of pro bono counsel expired.

The motions at bar followed.  Plaintiff, who has re-assumed his pro se status, alleged that: (a) he lost commutation credits and a hypothetical possibility of becoming eligible for an earlier release; (b) his cumulative SHU time, ensuing from his many infractions, was excessive; (c) the fact that he was charged with *.010 caused him emotional distress because it implied that he was connected to gang members; and (d) while in the SHU, he experienced ailments such as "rash," "inflamation," "diarrhea" and unspecified "bad pains,"and "received treatment from the prison medical providers . . . for a 'lump on his groin,' 'left arm,' 'left leg pain,' 'left anterior calf,' 'mild cellulites,' 'swollen lower extremity' and '3 lesions' the 'size of a quarter' from [his own] 'scratching.'"   Docket Entry No. 151, at 4-9.  He, therefore, asked to increase his monetary damages above $1 and to have his prison file expunged.

8

Meanwhile, a counseled motion was filed on behalf of Defendant Maniscaldo. It sought reduction of the $300 attorney's fee this Court awarded to Plaintiff's former pro bono counsel. The motion alleged that 42 U.S.C. § 1997e(d)(3) imposed a blanket rule capping all attorneys' fees in prisoners' § 1983 cases at 150% of the damages awarded. See Docket Entry No. 146-1. Defendant maintained that Parker v. Conway, 581 F.3d 198 (3d Cir. 2009), outright required reduction of the fee to $1.50 since Plaintiff succeeded at proving only $1 in damages. See id. at 3-4 (also citing Shepherd v. Goord, 662 F.3d 603 (2d Cir. 2011); Keup v. Hopkins, 596 F.3d 899 (8th Cir. 2010); Robbins v. Chronister, 435 F.3d 1238 (10th Cir. 2006); Johnson v. Daley, 339 F.3d 582 (7th Cir. 2003); Dannenberg v. Valadez, 338 F.3d 1070 (9th Cir. 2003); Volk v. Gonzalez, 262 F.3d 528 (5th Cir. 2001); Boivin v. Black, 225 F.3d 36 (1st Cir. 2000); and Walker v. Bain, 257 F.3d 660 (6th Cir. 2001).[6]

## II.   MOTION FOR RECONSIDERATION STANDARD

A motion for reconsideration is a device of limited utility. There are only four grounds upon which a motion for reconsideration might be granted: (a) to correct manifest errors of law or fact upon which the judgment was based; (b) to present newly-discovered or previously unavailable evidence; (c) to prevent manifest injustice; and (d) to accord the decision to an intervening change in prevailing law. See 11 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2810.1 (2d ed. 1995); see also Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir. 1985), cert. denied, 476 U.S. 1171 (1986). "To support reargument, a moving party must show that dispositive factual matters or controlling decisions of law were

---

[6] This Court held oral arguments on the attorney's fee issue. See Docket Entry No. 153. Defendant's counsel neither appeared at that hearing nor sought an adjournment. See id.

overlooked by the court in reaching its prior decision." <u>Assisted Living Assoc. of Moorestown, L.L.C., v. Moorestown Tp.</u>, 996 F. Supp. 409, 442 (D.N.J. 1998).  In contrast, mere disagreement with the district court's decision is an inappropriate ground for a motion for reconsideration: such disagreement are raised through the appellate process.  <u>See</u> <u>id.</u> (citing <u>Bermingham v. Sony Corp. of Am., Inc.</u>, 820 F. Supp. 834, 859 n.8 (D.N.J. 1992), <u>aff'd</u>, 37 F.3d 1485 (3d Cir. 1994); <u>G-69 v. Degnan</u>, 748 F. Supp. 274, 275 (D.N.J. 1990)).

## III.   PLAINTIFF'S MOTION

Plaintiff's motion warrants no increase in monetary damages.  In part, Plaintiff attempts to revive claims already dismissed at the summary judgment stage.  For instance, as to Plaintiff's loss of commutation credits and his request for expungement, this Court already explained:

> [an] expungement claim . . . might, perhaps, be viable if the sanction was rendered on the basis of no evidence at all or evidence that was false in its entirety.  <u>See</u> <u>Williams</u> [v. Federal Bureau of Prisons], 85 F. App'x [299,] 303 [(3d Cir. 2004)] (cautiously noting that the Fourth Circuit's holding in <u>Paine</u> [v. Baker], 595 F.2d [197,] 201 [(4th Cir.1979)], might . . . be adopted in such a unique scenario).  Here, however, Plaintiff outright conceded committing the administrative infractions he was charged with, <u>i.e.</u>, writing the letters utilizing the "code words" and transferring funds to another inmate's family member.  Thus, his sanctions were neither evidence-free nor based on wholly false evidence.  It follows that his expungement claim necessarily fails under the <u>Williams</u>-<u>Paine</u> test.
> . . .
> [Moreover, in] a series of cases beginning with <u>Preiser v. Rodriguez</u>, 411 U.S. 475 (1973), the Supreme Court has analyzed the intersection of 42 U.S.C. § 1983 and the federal habeas corpus statute, 28 U.S.C. § 2254.  One of these cases was <u>Heck v. Humphrey</u>, 512 U.S. 477 (1994).  There, the Supreme Court addressed the question of whether a prisoner could implicitly challenge the constitutionality of detention in a § 1983 suit seeking only damages (a form of relief not available through a habeas corpus proceeding).  The Court rejected § 1983 as a vehicle to implicitly challenge the lawfulness of detention.
>
> > In order to recover damages for allegedly unconstitutional . . . imprisonment, or for other harm caused by actions whose unlawfulness would render the sentence as currently calculated invalid, a § 1983

> plaintiff must prove that the sentence has been declared invalid by a state
> tribunal authorized to make such determination, or called into question by
> a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254.  A
> claim for damages bearing that relationship to a sentence that has not been
> so invalidated is not cognizable under § 1983.

Id. at 486-87.  Three years later, the Supreme Court expressly extended that rule
to prison disciplinary sanctions, holding that a prisoner cannot bring a suit under §
1983 where the success of that suit would necessarily imply an undue
disqualification from an early release.  See Edwards v. Balisok, 520 U.S. 641,
646-48 (1997).  Here, Plaintiff's application for the grant of damages exceeding
one dollar is . . . inviting this Court to violate the Heck-Balisok bar by entering a
quasi-habeas ruling that Plaintiff might be entitled to avoid serving his full term.
This the Court cannot do since Plaintiff's damages position is facially premature
and will remain such until and unless he obtains a favorable state-court or federal
habeas ruling actually reducing his term of imprisonment by a specific period . . . .

Harris, 2013 U.S. Dist. LEXIS 82034, at *20-25 (brackets, ellipses, footnotes and parenthetical

explanations omitted).  These repeated claims fail to assert an "actual injury" or even a

cognizable "injury" of any kind.

The new claims raised in Plaintiff's motion (i.e., that his cumulative SHU period was

excessive, or that he suffered emotional distress, or that he had an "inflamation/rash/diarrhea"

and "bad pains" during his SHU confinement, and "received treatment . . . for a 'lump on his

groin,' 'left arm,' 'left leg pain,' 'left anterior calf,' 'mild cellulitis,' 'swollen lower extremity'

and [his] 'scratching'") similarly fail to merit any increase in the damages awarded.  Moreover,

these new claims cannot now be raised.  See Bell v. City of Phila., 275 F. App'x 157, 160 (3d

Cir. 2008) (a litigant cannot plead new claims in any non-pleading document, be it moving

papers, an opposition to a motion or the litigant's traverse).

Petitioner's emotions experienced upon being charged with *.010, cannot qualify as

"actual injury." See Pryer v. C.O. 3 Slavic, 251 F.3d 448, 453 (3d Cir. 2001) ("[S]ubstantial

damages should be awarded only to compensate *actual injury*") (quoting <u>Carey</u>, 435 U.S. at 266)

(emphasis supplied); <u>see also</u> <u>Gagliardo v. Connaught Labs., Inc.</u>, 311 F.3d 565, 573 (3d Cir.

2002) (since "a plaintiff must show 'a reasonable probability rather than a mere possibility that

damages due to emotional distress were in fact incurred,'" his claim that his peers held him in

less esteem cannot qualify as damages unless he offers evidence that he suffered physically as a

result of his distress or presents evidence that he sought psychiatric counseling on that particular

issue) (quoting <u>Spence v. Bd. of Educ.</u>, 806 F.2d 1198, 1201 (3d Cir. 1986).

Plaintiff's conditions-of-confinement claim (asserting that his SHU housing caused him

"inflamation/rash/diarrhea/bad pains") has no causal connection to Officer Maniscaldo who

sanctioned Plaintiff to SHU confinement.  Nothing in the record suggests that Officer

Maniscaldo manipulated the SHU conditions to induce Plaintiff's ailments, and he cannot be

responsible for a derivative effect of those conditions.  Similarly, Plaintiff's lump on his groin,

his cellulitis, his scratching of himself, etc., are not causally connected to the procedural errors

that tainted Plaintiff's disciplinary hearing.[7]

Analogously, Plaintiff's displeasure with his *cumulative* SHU period that accrued during

his prison term is of no relevance to the procedural errors adjudicated here, since the errors

tainted only a single disciplinary hearing, <u>i.e.</u>, the one conducted in connection with Plaintiff's

"code words" letters, and that disciplinary hearing yielded *only one* SHU period that cannot be

aggregated with Plaintiff's other SHU periods for the purposes of his additional claims against

---

[7]  Moreover, such allegations cannot be converted in a viable claim of *any* kind, since
Plaintiff stated that he received medical treatment for each of these ailments.

Officer Maniscaldo.[8]  Simply put, had Plaintiff wished to litigate his aggregated-SHU-period

claim, he had to do so in a distinct and separate, timely commenced civil matter, not in the

motion at bar.

> Claim A against Defendant 1 should not be joined with unrelated Claim B against
> Defendant 2.  Unrelated claims . . . belong in different suits [so] to prevent the
> sort of morass that [a multi]-claim, [multi]-defendant suit produced [and] ensure
> that prisoners pay the required filing fees – for the Prison Litigation Reform Act
> limits to 3 the number of frivolous suits or appeals that any prisoner may file
> without prepayment of the required fees.  . . .  A buckshot complaint that would be
> rejected if filed by a free person – say, a suit complaining that A defrauded the
> plaintiff, B defamed him, C punched him, D failed to pay a debt, and E infringed
> his copyright, all in different transactions – should be rejected if filed by a
> prisoner.

George v. Smith, 507 F. 3d 605, 607 (7th Cir. 2007).

Therefore, this Court finds no basis to increase of Plaintiff's damages above $1.  Hence,

his motion is denied.

## IV.    DEFENDANT'S MOTION

Petitioner's motion suggests a pro se litigant's confusion. In contrast, Defendant's motion

for reduction of Plaintiff's pro bono counsel's fee to $1.50 caused this Court pause.

---

[8]  In Griffin v. Vaughn, 112 F.3d 703, 708-09 (3d Cir. 1997), the Court of Appeals held
that a 15-month confinement in a SHU did not impose an "atypical and significant hardship"
within the meaning of Sandin v. Conner, 515 U.S. 472, 480 (1995).  Moreover, a 15-month SHU
period adjudicated in Griffin is still below the time frame triggering constitutional concerns.  See
Dunbar v. Barone, 487 F. App'x 721 (3d Cir. 2012) (540 days at an SHU did not violate Sandin).
Here, Plaintiff stated that he was sanctioned to 365 days of SHU in connection with *two*
infractions: (a) his *.010 violation based on the "code words" letters; and (b) his other infraction
("perpetrating frauds, deceptions, confidence games, riots and escape plots").  It follows that the
SHU period imposed as a sanction resulting from the hearing tainted by Officer Maniscalso's
procedural errors had to be *less* than these 365 days, and such less-than-365-day SHU sanction
facially could not violate Plaintiff's rights under Sandin-Griffin-Dunbar.  Correspondingly, that
sanction cannot qualify as "actual injury" for the purposes of this Court's Carey analysis.

The Prison Litigation Reform Act of 1995 ("PRLA") contains a set of attorney's fees provisions that have been codified in Section 1997e(d).  These provisions state in pertinent part:

(1)     In any action brought by a prisoner who is confined to any jail, prison, or other correctional facility, in which attorney's fees are authorized . . . such fees shall not be awarded, except to the extent that – (A) the fee was directly and reasonably incurred in proving an actual violation of the plaintiff's rights protected by a statute pursuant to which a fee may be awarded . . . ; and (B) (i) the amount of the fee is proportionately related to the court ordered relief for the violation; or (ii) the fee was directly and reasonably incurred in enforcing the relief ordered for the violation.

(2)     Whenever a monetary judgment is awarded in [accordance with the prior subsection], a portion of the judgment (not to exceed 25 percent) shall be applied to satisfy the amount of attorney's fees awarded against the defendant.  *If the award of attorney's fees is not greater than 150 percent of the judgment, the excess shall be paid by the defendant.*

(3)     No award of attorney's fees in an action described in paragraph (1) shall be based on an hourly rate greater than 150 percent of the hourly rate established . . . for payment of court-appointed counsel . . . .

42 U.S.C. § 1997e(d) (emphasis supplied).

Although the italicized sentence does not state so, it has been occasionally construed as applicable to those matters where the fees were greater (rather than less or equal to) 150% of the damages awarded.  To perform the task of statutory construction, the courts must start with an examination of the statute's language and, if it is unclear or ambiguous, its legislative history, see Toibb v. Radloff, 501 U.S. 157, 161 (1991); Blum v. Stenson, 465 U.S. 886, 896 (1984), so to distill congressional intent.  See Morales v. Trans World Airlines, 504 U.S. 374, 383 (1992); Sec. Indus. Ass'n v. Bd. of Governors, 468 U.S. 137, 149 (1984).  Notably, the meaning of a statute must be distilled from a review of "the language and design of the statute as a whole."  K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 291 (1988).  Hence, the courts are obligated to examine the

14

statute's "full text, language as well as punctuation, structure and subject matter." United States Nat'l Bank v. Independent Ins. Agents of Am., Inc., 508 U.S. 439, 455 (1993) (citation and quotation marks omitted).[9]   Where a particular language is used in one section of a statute but not in another, the courts are obligated to presume that Congress did so intentionally rather than inadvertently.  See BFP v. Resolution Trust Corp., 511 U.S. 531, 537 (1994); Russello v. United States, 464 U.S. 16, 23.  Moreover, every statutory word is presumed to have a meaning, and that presumption obligates the courts to give effect to all the words in order to avoid an interpretation which would render some words superfluous or redundant.  See Lopez-Soto v. Hawayek, 175 F.3d 170, 173 (1st Cir. 1999); Ruiz v. Estelle, 161 F.3d 814, 820 (5th Cir. 1998), cert. denied, 119 S. Ct. 2046 (1999).

Here, the subsection (2) is unambiguously limited in its scope since it utilizes the qualifier reading, "*If* the award of attorney's fees is *not* greater than 150 percent of the judgment . . . ." 42 U.S.C. § 1997e(d)(2) (emphasis supplied).  And while some courts found that this 150% cap could also apply to a "greater-than-150%"scenario, even though the subsection (2) is silent as to such cases, those courts that meticulously examined this issue declined to adopt a cavalier approach and elected to tread carefully.

Since the literal and plain meaning of the words utilized by Congress addressed only the situation where attorney's fees are equal to or less than 150% of the judgment, see 42 U.S.C. § 1997e(d)(2), the words "if" and "not" in the clause"*If* the award of attorney's fees is *not* greater than 150 percent of the judgment" set forth a condition precedent.  An expansion of this 150%

---

[9]  "Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive."  Consumer Product Safety Commission v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980); accord Dunn v. CFTC, 519 U.S. 465, 470 (1997).

cap to all cases would automatically render these words, i.e., "if" and "not," wholly meaningless, offending the rules of statutory construction.[10]   The statute's history buttresses such a conclusion. The overriding congressional intent in passing the PLRA was to deter wholly frivolous lawsuits by prisoners.  See H.R. Conf. Rep. No. 378, 104th Cong., 1st Sess. 166 (1995).  Senator Dole's introductory remark stressed it by noting that some inmates challenged matters such as "a defective haircut by a prison barber, the failure of prison officials to invite a prisoner to a pizza party for a departing prison employee, and . . . being served chunky peanut butter instead of the creamy variety."  141 Cong. Rec. S14413 (daily ed. Sept. 27, 1995).  Nothing in the legislative history suggests that Congress was aiming to usurp judicial discretion by eradicating those cases that pass muster at the sua sponte screening stage and even yield the court's finding that an expenditure of a precious resource, i.e., pro bono counsel, is warranted.  See Tabron v. Grace, 6 F.3d 147, 156-58 (3d Cir. 1993) ("Before the court is justified in exercising its discretion in favor of [pro bono] appointment, it must first [find] that the claim has some merit in fact and law . . . [since] volunteer lawyer time is a precious commodity") (citations and quotation marks omitted).

---

[10]   This conclusion is even more apparent if the language of subsection (2) is read against the backdrop of subsection (3), which reads, "*No award* of attorney's fees . . . *shall* be based on an hourly rate greater than 150 percent of the hourly rate established . . . for payment of court-appointed counsel."  42 U.S.C. § 1997e(d)(3) (emphasis supplied).  Since subsection (3) immediately follows subsection (2) but, unlike subsection (2), it utilizes a very different, specific prohibitory language, i.e., "no award . . . shall," this verbal sequence indicates that the omission of such prohibitory language in subsection (2) was purposeful on the part of Congress.  See Russello, 464 U.S. at 23.  Had Congress meant to cap attorney's fees at 150% of judgment in all prisoners' cases, it would have stated so by using the same prohibitory language: "no award of attorney's fees shall exceed 150%."  The fact that Congress omitted from section 1997e(d) any discussion of those cases where an award of attorney's fees exceeds 150% of the judgment cannot qualify as a sufficient basis for blindly expanding subsection (2) beyond its stated limits.  See Union Bank v. Wolas, 502 U.S. 151, 158 (1991); West Virginia Univ. Hosp. Inc. v. Casey, 499 U.S. 83, 100 (1991) (if the statutory language is plain, a court shall not enlarge or supplement it with a language the court might fancy was "forgotten" by Congress).

16

Analogously, nothing in the statute's legislative history suggests that Congress aimed to obstruct appointment of pro bono counsel to indigent litigants simply because these litigants were held in confinement and their legal victories did not grab the evening news.  See Powell v. Symons, 680 F.3d 301, 310 n. 9 (3d Cir. 2012) ("Tabron repudiated" the notion that "appointment of counsel is warranted only upon a showing of . . . the likelihood of *substantial* prejudice to plaintiff") (quoting Tabron, 6 F.3d at 155, internal quotation marks omitted, emphasis supplied); see also 141 Cong. Rec. S14413 (the goal was to "dramatically reduce the number of *meritless* prisoner lawsuits," not meritorious cases that yield modest or nominal victories) (emphasis supplied).[11]

Since such expansion of the statutory language and ignorance of legislative history was unfathomable to the majority of the legal profession, the bulk of § 1997e(d)(2) case law did *not* focus on the calculative process; rather, it focused on equal protection challenges asserting that the provision could unfairly chill prisoners' civil rights litigation while leaving other civil rights actions unaffected.  That challenge was addressed by the Court of Appeals for the Third Circuit. Collins v. Montgomery County Bd. of Prison Inspectors, 176 F.3d 679, 682 (3d Cir. 1999) (en banc) (the key issue was "whether the PLRA's attorney's fee provisions violate the equal protection of the law guarantee").

---

[11]  A fortiori, nothing in the statute or its legislative history suggests that Congress was encouraging the courts to insult those lawyers who generously give their time, wisdom and ardor to the noble cause of pro bono litigation by penalizing these attorneys for their clients' Pyrrhic victories by awarding them a "buck and two bits" fee insufficient to purchase even a box of cereal.

In <u>Collins</u>, the district court upheld Section 1997e(d)'s constitutionality.  <u>See</u> <u>Collins v.</u> <u>Algarin</u>, 1998 U.S. Dist. LEXIS 83 (E.D. Pa. Jan. 9, 1998).[12]  The Court of Appeals affirmed by an equally divided <u>en</u> <u>banc</u> bench.  <u>See</u> <u>Collins</u>, 176 F.3d at 686 ("We have divided equally on the question of whether the limitation of the fees to 150% of the judgment is constitutional and consequently we will [have to] affirm the order of the district court to the extent that it upheld that provision").[13]  Nothing in <u>Collins</u> suggested that an equal protection durability of §1997e(d), if such is found, could be converted into a mandate to apply this provision to the cases yielding nominal damages.  <u>See generally</u>, <u>id.</u>,176 F.3d 679.

A decade later, the Court of Appeals revisited that equal protection issue in <u>Parker</u> and, this time, expressly ruled that the statute did not offend the equal protection guarantees for the purposes of the prisoner/not-prisoner duality.  <u>See</u> 581 F.3d 198.[14]  Again, as in <u>Collins</u>, not a

---

[12]  In <u>Collins</u>, a jury found that an inmate's rights were violated because his prison officials used excessive force and "sicced" a police dog on him.  The jury awarded the inmate $20,000 in damages.  The inmate's appointed counsel first sought $80,122 in attorneys' fees, then reduced that figure to $72,333, and then to $30,000.  The district court conducted an equal protection analysis of the PLRA, found it constitutional in its entirety and correlated the fees to the award.

[13]  It appears that decisions of a divided <u>en</u> <u>banc</u> court are, technically, not binding.  <u>See</u> <u>Tunis Bros. Co., Inc. v. Ford Motor Co.</u>, 763 F.2d 1482, 1501 (3d Cir. 1985) (a district court's order "affirmed by an equally divided court sitting <u>en</u> <u>banc</u>, . . . while instructive, . . . lack[] in precedential value"), <u>vacated</u> <u>on</u> <u>other</u> <u>grounds</u>, 475 U.S. 1105 (1986).  However, since <u>Collins</u> poses no contradiction to the findings here, this Court reads <u>Collins</u> as binding but inapposite.

[14]  In <u>Parker</u>, an inmate commenced an Eighth Amendment action after being physically assaulted by a prison guard.  After the jury awarded the inmate $17,500 in damages, his counsel moved for $64,089 in attorneys' fees.  Relying on §1997e(d), the district court reduced the fee to $26,250, and the Court of Appeals affirmed that ruling upon addressing those facts.

18

single word in <u>Parker</u> suggested that the equal protection durability of §1997e(d) could be converted into a directive to apply it in those cases that yielded only nominal damages.[15]  <u>See id.</u>

Two and a half years passed by.  On March 9, 2012, Judge Hardiman authored the <u>Velius</u> decision addressing the issue left untouched in <u>Collins</u> and <u>Parker</u>, <u>i.e.</u>, what was the mode of calculating the attorneys' fee in a matter where the damages were limited to $1.  Since the <u>Velius</u> Panel resolved that issue under <u>Farrar</u> and without mentioning § 1997e(d) even in a footnote, this Court expressly directed the parties' attention to <u>Velius</u> and <u>Farrar</u>, thus saving them the need to distill the governing precedent.  And yet, Defendant's motion wholly ignored both <u>Farrar</u> and the guidance provided in <u>Velius</u>.  Instead, it relied on eight decisions of other appellate courts.  None of these eight rulings is persuasive.

For instance, in <u>Walker v. Bain</u>, 257 F.3d 660 (6th Cir. 2001), a two-judge majority justified its election to limit the amount of attorneys' fees by offering the following explanation:[16]

> We are aware that § 1997e(d)(2)  [if expanded to those matters where prisoners' victories yield modest financial awards] will have a strong chilling effect upon counsels' willingness to represent prisoners who have meritorious claims.  We are also mindful that the "marginal or trivial" claims that result in a judgment for a prisoner, such as [here], do in fact arise out of an actual, proven civil rights violation.  We admit to being troubled by a federal statute that seeks to reduce the number of meritorious civil rights claims and protect the public fisc at the expense of denying a politically unpopular group their ability to vindicate actual . . . civil

---

[15]  After issuing <u>Parker</u>, the Court of Appeals cited it only thrice, <u>see</u> <u>Cooper v. Menges</u>, 2013 U.S. App. LEXIS 20110 (3d Cir. Oct. 2, 2013); <u>Vitalis v. Sun Constructors, Inc.</u>, 481 F. App'x 718 (3d Cir. 2012); and <u>B&G Constr. Co. v. Dir., OWCP</u>, 662 F.3d 233 (3d Cir. 2011), and *never* in the context of Section 1997e(d) or even in connection with *any* attorney's fee issue.

[16]  In <u>Walker</u>, an inmate, who acted as a "jailhouse lawyer," <u>i.e.</u>, assisted other inmates with filing grievances against correctional officers, had his prison cell searched in retaliation and won $425 in damages.  The inmate and his appointed counsel then sought "joint" attorneys' fees in the amount of $34,493 for their "joint" legal efforts.  <u>See</u> <u>Walker v. Bain</u>, Civ. Action No. 95-76273 (PJK) (E.D. Mich), Docket Entries Nos. 168 and 172.

rights violations.  However, we are aware that we are not authorized to act as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines.  Moreover, our role is not to judge the wisdom, fairness, or logic of legislative choices.  Accordingly, we must conclude that § 1997e(d)(2) survives rational review.

Walker, 257 F.3d at 670.

Unanswered by Walker remained the question of how § 1997e(d)(2)'s ability to meet the rational review test for the purposes of an equal protection attack was transformed into a judicial obligation to apply this provision to a scenario this provision did not even address.  It appears that the Walker majority first created its own conundrum by expanding subsection (2) in a blanket fashion and then elected to lament over the Frankenstein's-monster qualities of its own creation, all while blaming the lawmakers for the shortcomings Congress never actually made.

The rationale offered in Boivin v. Black, 225 F.3d 36 (1st Cir. 2000), appears even more puzzling.  There, a pre-trial detainee sued the prison officer who supervised him being placed in a restraint chair.  After the detainee won $1, his counsel moved for and obtained the trial court's award of $3,892 in attorney's fee.  The appellate court reduced it to $1.50 by relying on § 1997e(d)(2).  Striving to address the issue left unanswered in Walker, the appellate court in Boivin justified its blanket expansion of the subsection (2) by stating that

the cap on attorneys' fees is not a barrier to court access, but a limitation on relief . . . [since] the fee cap only affects how claims are presented and does not preclude any prisoner from actually bringing a claim. . . .  The fee cap fits . . . snugly with the goal of reducing the volume of *frivolous* suits because it has the principal effect of encouraging both prisoners and *lawyers who are mulling whether to bring covered cases to ask if the game is worth the candle . . . .*

Id. 225 F.3d at 45 (emphasis supplied).[17]

The Boivin ruling, however, failed to notice that: (a) the case was expressly found *not* frivolous (even though it yielded only nominal damages); and (b) the *magistrate judge* who appointed pro bono counsel to the detainee was the one "mulling whether . . . the game [was] worth the candle" and finding it worthy.  Since the Boivin court de facto invited counsel to reject magistrate judges' findings that "the game [was] worth the candle," Boivin necessarily implied a grant of judicial leave to obstruct judicial operations, an invitation that this Court finds inappropriate.

Even a decade after Boivin, the courts blindly expanding § 1997e(d)(2) are still struggling with the task of finding a justification for the conundrum they keep creating.  See, e.g., Shepherd, 662 F.3d 603.  For instance, the Shepherd court stated:

> § 1997e(d)(2) is *not* a model of clarity.  See Blissett v. Casey, 147 F.3d at 220 (noting § 1997e(d)(2)'s "unclear language").  Nevertheless, this language is *not so ambiguous as to require us to resort to canons of statutory construction* or to legislative history to discern its meaning.  See Bruesewitz v. Wyeth LLC, 131 S. Ct. [1068,] 1081 (2011); United States v. Gray, 642 F.3d 371, 377 (2d Cir. 2011).  Indeed, for more than a decade, we have observed that § 1997e(d)(2) "effectively caps a defendant's liability for attorneys' fees in a prisoner's § 1983 action at 150% of a money judgment."  Torres v. Walker, 356 F.3d 238, 242 (2d Cir. 2004); see Blissett v. Casey, 147 F.3d at 220 (stating that § 1997e(d)(2) "appears

---

[17]  The same defect taints the holding in Robbins, 435 F.3d 1238, where an arrestee who tried to back his vehicle into the arresting officer and caused the officer to shoot at the hood of the arrestee's car, won $1, while his counsel was awarded a $9,689 fee.  The Robbins court reduced the fee to $1.50 while stating, "We can understand the frustration that the district court must have felt after having requested [the attorney] to represent [the arrestee]. Certainly, [the attorney's] performance at oral argument before [the Tenth Circuit] indicates how fortunate [the arrestee] was to have such a compelling advocate on his side.  But any temptation we may have to reward [the attorney] for his service is overcome by our duty to respect an Act of Congress."  Id. at 1244.  As in Walker, the Robbins court first created its own predicament by reading subsection (2) overbroadly and then lamented over the inequitable effect of its own creation while blaming the legislature for the poor mandate which the legislators *never promulgated*.

to provide that fee award is not to be borne by the defendant to the extent it exceeds 150 percent of the judgment").

Id. at 607 (original ellipses and brackets omitted, emphasis supplied).[18]

The logic of Shepherd escapes this Court.  It is axiomatic that the rules of statutory construction apply to *all* statutes, regardless of whether their language is ambiguous (and, thus, calls for a review of, e.g.,"bill jackets") or sufficiently direct to distill the statutory mandate from the plain meaning of words.  See, e.g., Toibb, 501 U.S. at 161.  In addition, a concession that "[the statute] is *not* a model of clarity" and admittedly guessing statements, such as "[the statute] *appears* to provide" and "[the statute] *effectively* [provides]," id. (emphasis supplied), cannot be harmonized with the position that the statutory mandate is crystal clear, especially Shepherd applied the statutory language to a scenario statute did *not* address.[19]  In sum, the "overwhelming

---

[18]  The rationale of the Shepherd court's citation to Bruesewitz, 131 S. Ct. 1068, is not immediately apparent to this Court, since Bruesewitz did *not* address any § 1997e(d) issue and, moreover, while reflecting on 42 U.S.C. § 300aa-15(e), expressly held that attorney's fee must be provided for successful and *even unsuccessful* claims, so long as those claims were not frivolous. See Bruesewitz, 131 S. Ct. At 1074.  If a nexus could be drawn between Bruesewitz and Section 1997e(d)(2), that nexus prompts *against* the Shepherd holding.  And, as to Shepherd's citation to Gray, that citation is even more bewildering, since the Gray claim ensued from an internal prison investigation and raised only the issue of agency jurisdiction, wholly unrelated to attorney's fees.

[19]  While the legal logic of Shepherd is troubling, its outcome is understandable.  There, an inmate alleged that his rights were violated by a legitimate search because the prison officers touched his "sacred" dreadlocks without his permission, thus offending his Rastafarian beliefs. On the eve of the trial, the district court appointed a U.S. Deptment of Veterans Affairs counsel to represent the inmate solely for the purposes of the trial.  See Shepherd v. Goord, Civ. Action No. 04-0655 (DNH) (N.D.N.Y.), Docket Entry No. 133.  While the jury awarded the inmate only $1 in damages, his appointed counsel moved for $99,485 in attorney's fee for her trial services. The district court limited her fee to $1.50 under § 1997e(d)(2).

tide of case law" asserted in Defendant's motion is nothing but a handful of cases that cannot be harmonized with the statute itself and the rules of statutory construction.[20]

    Neither binding nor persuasive, the eight cases relied upon in Defendant's motion cannot eliminate or alter the guidance provided in <u>Farrah</u> and <u>Velius</u>. If anything, these cases verify that

---

[20] For instance, the decision in <u>Johnson</u>, 339 F.3d 582, relied upon in Defendant's motion, is: (a) of no relevance here, since it dealt with hourly rates; and (b) stated:

> Free persons are not constitutionally entitled to liver transplants or other costly medical care at public expense. . . . [Had the plaintiff been] a free person, [he would not be able to assert a constitutional claim on the basis of his three-year liver transplant delay, he would have to claim] that a physician committed the tort of malpractice. And [since] the prevailing party in tort litigation must bear 100% of his own attorneys' fees, [defendant would not have to pay such fees since a] free person still must cover his own legal costs, even if he shows gross negligence or wilful misconduct by the physician. . . . If we compare prisoners . . . with free persons who received bad medical care, . . . the question should be why prisoners receive legal services at defendants' expense, and free persons do not. [Moreover, if the plaintiff] had been free and unable to pay for a liver transplant [he would] have [to] request[] medical care under Medicaid [and, had he suffered a delay], there would not have been any option to litigate. . . . Such a free person is decidedly worse off than a prisoner. Or consider how [the plaintiff] would have been treated as a veteran seeking medical care in a Veterans Administration hospital. A decision by the hospital's staff deferring his eligibility for a liver transplant would have been subject to review by an administrative tribunal but not the Article III courts. And, until recently, veterans were prohibited from paying attorneys more than $10 [and so the plaintiff's counsel would get just $10].

<u>Id.</u> at 587-88. It is unlikely that this Circuit would adopt such a "race-to-the-bottom" analysis comparing the rights of free persons to those of imprisoned persons in order to punish imprisoned persons for the unfortunate societal failure to ensure sufficient medical care to free persons. <u>A fortiori</u>, it is unlikely that this Circuit would employ such analysis to calculate attorneys' fees for representing those who are not incarcerated. Therefore, this Court is not persuaded by <u>Johnson</u>. Nor is the Court persuaded by <u>Dannenberg</u>, 338 F.3d 1070, another case relied upon by Defendant. In <u>Dannenberg</u>, an inmate won $9,000 in damages, and his counsel requested $57,566 in attorneys' fees. Those attorneys' fees were reduced by the appellate court under § 1997e(d)(2) because the inmate prevailed only on his retaliation claim and not on his medical care-related claims. Our legal system, however, does not require counsel to win on every claim raised against every named defendant in order to be awarded attorneys' fees of more than "a buck and two bits."

some sort of "creative," halfhearted legal argument can, perhaps, always be fashioned.  However, such "argument [necessarily] falls like a house of cards" since it builds on quick-sand of sophistry.  See, e.g., United States v. Kemper, 1991 U.S. App. LEXIS 2779, at *6 (4th Cir. 22, 1991).

The case at bar illustrates the same.  Here, it was adjudicated – and the defense never disputed – that Officer Maniscaldo violated Plaintiff's procedural due process rights when, prior to Plaintiff's administrative hearing based on his "code words" letters, Officer Maniscaldo denied Plaintiff an opportunity to examine the letters (and, seemingly, erroneously construed Plaintiff's post-charge written statement as one of those "code words" letters).  Thus, technically, Plaintiff is entitled to injunctive relief in the form of a procedurally proper curative administrative as to those "code words" letters.

> "If a federal court determines that an inmate's due process rights were violated during an administrative hearing, the proper remedy is a curative administrative hearing conducted in accordance with due process requirements (only if the administrative body expressly fails to comply with a judicial order directing new and procedurally correct hearing, such failure gives basis to the court's further intervention, e.g., by means of holding an in-court hearing . . . .)."  Cannon v. Schultz, 2010 U.S. Dist. LEXIS 59468, at *16-17 (D.N.J. June 16, 2010) (citing Mickens-Thomas v. Vaughn, 355 F.3d 294 (3d Cir. 2004); Toolasprashad v. Grondolsky, 570 F. Supp. 2d 610, 631 (D.N.J. 2008) ("The only remedy the court can give is to order the administrative body to correct the abuses or wrongful conduct within a fixed period of time") (quoting Billiterri v. United States Board of Parole, 541 F.2d 938, 943-44 (2d Cir. 1976), and citing Furnari v. United States Parole Comm'n, 531 F.3d 241 (3d Cir. 2008)); cf. Wilkinson v. Dotson, 544 U.S. 74, 125 S. Ct. 1242, 161 L. Ed. 2d 253 (2005) (pointing out that a procedurally proper curative administrative proceeding might yield a substantive determination identical to that reached as a result of a procedurally defective administrative proceeding); Howard v. United States Bureau of Prisons, 487 F.3d 808 (10th Cir. 2007) (remanding the case for further proceedings envisioning, inter alia, a curative administrative hearing)).

Mitts v. Zickefoose, 869 F. Supp. 2d 568, 575 and n.13 (D.N.J. 2012).[21]

Since Plaintiff: (a) conceded writing and mailing his "code words" letters; (b) was legitimately charged with *.010; and (c) disciplined with a sanction allowed under that charge, his curative hearing is likely be nothing but an exercise in etiquette lacking all practical effect. That very point was the basis for this Court's finding that, under Carey, he was entitled only to $1 in damages. As the Court's prior decision detailed, had Officer Maniscaldo conducted a procedurally proper hearing, he could have sanctioned Plaintiff to the disciplinary measure he had imposed after holding the procedurally deficient hearing litigated here.[22] Mindful of such mere etiquette value of a curative hearing and the toll this prolonged litigation might have taken on the parties, this Court dispensed with any reflection on Plaintiff's implied right to injunctive relief. However, in light of Defendant's motion and Defendant's position that the cases cited by Defendant should apply to the case at bar, the Court finds it warranted to amend its prior decision and expressly direct injunctive relief, that is, in addition to granting Plaintiff $1 in damages.[23]

---

[21] Nothing in Wilkinson prohibits injunctive relief which, de facto, is a mere exercise in etiquette. Cf. Fain v. Morgan, 255 F. App'x 644 (3d Cir. 2007) (remanding the case so the district court would direct a curative parole hearing under Wilkinson, even though, by the time the Court of Appeals ruled, the inmate had already completed serving his maximum sentence and notified the courts, and that fact transformed his "curative parole hearing" into a hypothetical, and the district court's obligation to direct curative hearing into a mere exercise in etiquette).

[22] If Plaintiff has a curative hearing as to that charge, it is unlikely that his sanction would be *less severe* since he already satisfied the sanction previously imposed. It is also unlikely that his sanction would be *more severe* since an increase in sanction would trigger a retaliation claim.

[23] Indeed, the very cases and tribunals upon which Defendant relied have expressly held that Section 1997e(d)(2) was "inapplicable if the plaintiff secured non-monetary relief in addition to nominal damages." Pearson v. Welborn, 471 F.3d 732, 742-43 (7th Cir. 2006) (drawing a distinction from the position taken in Johnson, 339 F.3d 582, and quoting, in support of that distinction: (a) Boivin, 225 F.3d at 41, n.4, for the observation that, "[i]n a case in which the

(continued...)

## V.      CONCLUSION

For the foregoing reasons, Plaintiff's motion seeking increase of his monetary award will be denied.  That award will remain at $1.  Defendant's motion seeking reduction of counsel's fee to $1.50 will also be denied.  That award will remain at $300.  However, this Court's prior order will be amended to the extent that it would expressly incorporate the injunctive measure to which Plaintiff was implicitly entitled under this Court's prior disposition, and he will be granted additional relief in the form of a procedurally proper curative hearing as to his *.010 charge.

An appropriate Order accompanies this Opinion.


/s/ Dickinson R. Debevoise
**Dickinson R. Debevoise,**
**United States District Judge**

Dated: March 28, 2014

---

[23](...continued)
court orders non-monetary redress (say, an injunction) along with a monetary judgment, the fee cap would not restrict the total amount of attorneys' fees that the court could award": (b) Walker 257 F.3d at 667, n.2, for the observation that, "if non-monetary relief is obtained, either with or without money damages, § 1997e(d)(2) would not apply"; and (c) Dannenberg, 338 F.3d at 1075, for the observation that, "fees incurred to obtain injunctive relief, whether or not monetary relief was also obtained as a result of those fees, are not limited [by Section 1997e(d)(2)]"); see also Foulk v. Charrier, 262 F.3d 687, 703-04 n.17 (8th Cir. 2001) ("if nonmonetary relief is ordered (whether with or without a monetary award), the attorney's fees cap in 42 U.S.C. § 1997e(d)(2) does not apply") (thus distinguishing the Eighth Circuit's finding in Keup, 596 F.3d 899).